UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                               Chapter 11

Nassau Brewing Company Landlord LLC,                 Case No.  21-41852-JMM

                                  Debtor.                   Hon. Jil Mazer-Marino
---------------------------------------------------------------x


# REVISED CHAPTER 11 PLAN OF REORGANIZATION
# OF NASSAU BREWING COMPANY LANDLORD LLC


**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE DEBTOR'S PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT YET BEEN APPROVED.**


Dated:  New York, New York
        January 10, 2024

                                              **Goldberg Weprin Finkel Goldstein LLP**
                                              125 Park Avenue, 12th Floor
                                              New York, NY 10017
                                              (212) 221-5700
                                              Kevin J. Nash, Esq.

                                              *Attorneys for the Debtor*

Nassau Brewing Company Landlord LLC (the "Debtor") hereby proposes the following Revised Chapter 11 plan of reorganization (the "Plan") pursuant to title 11 of the United States Code (hereinafter the "Bankruptcy Code").

## ARTICLE I

## OVERVIEW OF THE PLAN

After extensive negotiations, the Debtor entered into a proposed global settlement (the "Proposed Settlement") with its senior mortgage lender, Valley National Bank ("VNB") and its master tenant, Nassau Brewing Company Master Tenant LLC (the "Master Tenant") earlier this year providing for an agreed exit strategy to conclude this Chapter 11 case. The Proposed Settlement has been memorialized by the parties in a certain Term Sheet dated on or about April 18, 2023 (the "Term Sheet"), the material terms of which are incorporated under the Plan and will be implemented through the Plan and confirmation process based upon the anticipated sale of the Debtor's property. To the extent applicable, confirmation of the Plan shall be deemed approval of the Proposed Settlement for purposes of Bankruptcy Rule 9019(a).

Contemporaneously herewith, the Debtor has entered into a Stalking Horse Contract to sell the Property for $18.25 million subject to competitive bidding as provided below. Thus, the Plan provides for the disposition of the Debtor's real property at 945 Bergen Street, Brooklyn, NY (the "Property") via a sale, in the first instance. The Property is ready for sale following the completion of renovations during the Chapter 11 case. The post-petition renovations were made possible by the funding of a super-priority DIP Loan by VNB and an affiliate of Churchill Real Estate Holdings LLC (CF-IF-2020-1 LLC) ("Churchill") in the total principal sum of $7,980,631.74 to complete the redevelopment.

By virtue of the DIP financing, the Property is now fully redeveloped as a residential apartment building containing 38 units with about 6,000 square feet of commercial retail space, although additional work needs to be done to obtain a Temporary Certificate of Occupancy. The Debtor has begun leasing activity and is generating average monthly rents of approximately $120,000.

In order to exit Chapter 11, the Debtor is implementing a toggle-type reorganization strategy developed over a period of many months based upon negotiations with VNB, Churchill and the Master Tenant. While the Plan provides for the remote possibility of a financing option (the "Refinancing"), the sale of the Property has been chosen by VNB as the best path forward. Thus, absent completely unforeseen events, the Property will be sold to implement the Plan under the sale option (directly with a third-party or by credit bid by VNB or through a transfer of membership interests of the Debtor, in each circumstance in a manner that preserves the historic tax credits (the "Historic Tax Credits")) (hereinafter the "Sale"). VNB has indicated that it intends to credit bid if a third-party sale cannot be achieved.

As noted, the Debtor has obtained a signed sales contract (the "Stalking Horse Contract") with Goose Property Management, LLC or its designee (the "Stalking Horse") to sell the Property for $18,250,000 subject to competitive bids. The Historic Tax Credits shall be preserved under the Stalking Horse Contract after closing throughout the period commencing on the date of the last "qualified rehabilitation expenditure" for the Historic Tax Credits (*i.e.*, December 31, 2022) and ending on the 5-year anniversary thereof (i.e., December 31, 2027) (the "HTC Compliance Period").

Likewise, the Debtor's prior assumption of the existing Master Lease Agreement dated December 21, 2018, as amended (the "Master Lease") between the Debtor, as landlord, and  the

Master Tenant (an entity that is 99% owned by Chase Community Equity, LLC, as the Historic Tax Credit investor (the "HTC Investor")), as master tenant, pursuant to Order dated September 13, 2023 (the "Lease Assumption Order") shall remain in place regardless of what option occurs. The assumption of the Master Lease allows the Debtor to preserve various Historic Tax Credits for the Property. In consideration for preservation of the Historic Tax Credits in the manner described in this Plan, and subject to the Property obtaining a Temporary Certificate of Occupancy ("TCO") and all requisite components thereof, including any of those required from the Office of Environmental Remediation for Master Tenant to operate and lease the Property, the Master Tenant shall pay the Debtor's estate the sum of $3.5 million (as may be adjusted to give credit for various considerations described in the Term Sheet, including the satisfaction of various contingencies described in this Plan) to help fund the Debtor's obligations hereunder. Some or all of the cash payment shall be held as a component of Available Cash under the Plan. Such cash payment by Master Tenant is contingent upon: (1) completion of 2021 and 2022 tax returns for the Debtor, including the pass-through election relating to the Historic Tax Credits to be filed as part of the 2022 tax returns for the Debtor, as reviewed and approved by Master Tenant, (2) completion of the final "cost certification" from Cohn Reznick LLP for the Historic Tax Credits (the "HTC Cost Certification"), with certified Historic Tax Credit eligible "qualified rehabilitation expenditures" of at least the amount shown in the draft "cost certification" provided to the Master Tenant, and (3) finalization and execution of the Master Tenant Assignment and Assumption Agreement that is contemplated by the Lease Assumption Order (collectively, the "Master Tenant's Conditions").

The Debtor remains confident that a Sale can be achieved in light of the executed Stalking Horse Contract. The Debtor has retained the brokerage firm of Cushman and Wakefield Realty of

Brooklyn pursuant to Order dated July 5, 2023, which is actively marketing the Property and obtained the Stalking Horse. The marketing and Sale process shall continue to run in tandem with proceedings to consider approval and confirmation of the Plan. As an alternative, although it is extremely unlikely to occur, the Debtor could still pursue a potential refinancing of the Property (to be employed in the event that a consensual sale cannot be achieved). The goal of a refinancing would be to generate sufficient proceeds to pay the DIP Loan in full, together with allowed Administrative Expenses, Priority Real Estate Tax claims and establish a general creditor fund of $250,000. The balance of a refinancing would then go to repay VNB on account of its pre-petition debt in the sum of $17,667,972.51 with VNB to retain a subordinate lien against the Property (post-confirmation) to secure its deficiency claim. For purposes of the Plan, however, VNB has waived any entitlement to share in the Creditor Fund on account of its deficiency claim.

## ARTICLE II

## DEFINITIONS

The following terms not otherwise defined shall have the following meanings for purposes of the Plan.

2.1.    **"Administrative Bar Date"** means the date that is thirty-five (35) days after the Effective Date for the filing of post-petition Administrative Claims.

2.2.    **"Administrative Claim"** means a Claim or request for payment of costs and expenses of administration allowable under Sections 503(b) or 507(b) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Property and operating the business of the Debtor; (b) Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) the U.S. Trustee fees and charges assessed against the Debtor's estate under chapter 123 of title 28 United States Code.

2.3.    **"Allowed"** means, with respect to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance, priority, or amount has been filed, and no request for estimation or other challenge has been interposed, or (ii) as to a Claim subject to objection, which has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest that is

compromised, settled, or otherwise resolved pursuant to Final Order, (c) any Claim or Interest as to which the liability of the Debtor and the amount thereof are determined by a Final Order, or (d) any Claim or Interest expressly allowed hereunder.

2.4. **"Available Cash"** means the combination of the Master Tenant's payment of $3.5 million (as may be adjusted) plus the net proceeds generated from either the Sale or Refinancing, to be distributed by the Disbursing Agent in accordance with the terms of this Plan after payment of brokerage, a break-up fee as applicable, auction expense as applicable, and reasonable closing costs and expenses.

2.5. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Eastern District of New York having jurisdiction over this Chapter 11 case.

2.6. **"Bar Date"** means March 9, 2022, the date fixed by Amended Order of the Bankruptcy Court entered on February 1, 2022 [ECF #74], subsequent to which date a Proof of Claim may not be timely filed.

2.7. "**Claim**" means any claim as defined in Section 101(5) of the Bankruptcy Code.

2.8. "**Claims Objection Deadline**" means a date to be fixed by the Bankruptcy Court as the deadline for objecting to a Claim asserted by a Creditor against the Debtor.

2.9. **"Class"** means a category of Claims or Interests as set forth in this Plan pursuant to Section 1122(a) of the Bankruptcy Code.

2.10. "**Confirmation Hearing**" means the hearing conducted by the Bankruptcy Court pursuant to Section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

2.11. **"Confirmation Order"** means the Order confirming the Plan pursuant to § 1129 of the Bankruptcy Code.

2.12. **"Creditor"** means a holder of an Allowed Claim.

2.13. "**DIP Lender**" means VNB in its capacity as lead lender and CF-IF 2021-1 LLC ("Churchill") in its capacity as participating lender with respect to the DIP Loans.

2.14. "**DIP Loans**" means the post-petition financing provided by the DIP Lender on a Super-Priority basis under 11 U.S.C. §364(c) and (d) pursuant to Final Order dated January 27, 2022 [ECF No. 72] and Final Supplemental Order dated August 1, 2022 [ECF No. 112] in the aggregate principal sum of $7,980,631.74.

2.15. **"Disbursing Agent"** means the Debtor's counsel, Goldberg Weprin Finkel Goldstein LLP, which shall receive the net proceeds of either the Sale or Refinancing of the Property.

2.16. **"Disclosure Statement"** means the disclosure statement for the Plan, including all exhibits and schedules thereto, (as amended, supplemented, or modified from time to time) that has been conditionally approved pursuant to 11 U.S.C. §105(d)(2)(B).

2.17. **"Disputed"** means, with respect to any Claim or Interest that is subject to objection.

2.18. **"Effective Date"** means the closing on the Sale or unlikely Refinancing after entry of the Confirmation Order.

2.19. "**Equity Interest**" means the membership and equity interests in the Debtor.

2.20. **"Final Order"** means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk on the docket in this Chapter 11 case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (x) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired.

2.21. "**General Creditor Fund**" means the pool of funds totaling $250,000 to be established from either the sale or refinancing of the Property for the purpose of funding a pro rata distribution to General Unsecured Creditors.

2.22. "**General Unsecured Claim**" means any unsecured Claim (other than an Administrative Claim or Priority Tax Claim.

2.23. "**Impaired**" means impaired within the meaning of Section 1124 of the Bankruptcy Code.

2.24. **"Petition Date"** means July 16, 2021.

2.25. "**Pre-Petition Senior Mortgage Debt**" means that the pre-petition loans and corresponding mortgage liens granted in favor of VNB in its capacity as senior lender encumbering the Property to collateralize the pre-petition acquisition and construction loans in the original respective sums of $3,750,000 and $14,250,000, since reduced to a total of $17,667,972.51.

2.26. "**Priority Real Estate Tax Claim**" means a Claim of the City of New York for unpaid real estate taxes and associated charges.

2.27. "**Pro Rata Share**" means with respect to any distribution on account of an Allowed General Unsecured Claim, equal in amount of the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of the General Creditor Fund.

2.28. "**Professional Compensation**" means all legal fees and reimbursable expenses for services rendered by the Debtor's counsel in this Chapter 11 case.

2.29. **"Property"** means the real property owned by the Debtor and the improvements thereon, consisting of a residential apartment building with retail shopping located at 945 Bergen Street, Brooklyn, New York.

2.30. **"Reorganized Debtor"** means the Debtor after the Effective Date.

2.31. **"Schedules"** mean the schedules of assets and liabilities and statement of financial affairs filed by the Debtor in accordance with § 521(l) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules.

2.32. **"Secured Claim"** means an Allowed Claim, including all amounts, if any, allowed pursuant to § 506(b) of the Bankruptcy Code, to the extent that it is secured by a lien on property in which the Debtor has an interest or that is subject to set-off under § 553 of the Bankruptcy Code, to the extent of the value of the Claim is determined pursuant to § 506(a) of the Bankruptcy Code.

2.33. "**United States Trustee**" means the United States Trustee for Region 2.

## ARTICLE III

## TREATMENT OF UNCLASSIFIED CLAIMS

3.1    Pursuant to § 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims, which shall be paid in full.

3.2    **Administrative Claims.** Each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in full on the later of (i) the Effective Date; (ii) five (5) business days after such Administrative Claim becomes an Allowed Claim; or (iii) a date that may be otherwise mutually agreed in writing between the Disbursing Agent and the holder of such Administrative Claim; <u>provided</u>, however, that any Administrative Claim incurred by the Debtor in its ordinary course of its business shall be paid in accordance with the parties' underlying terms and conditions without receiving a specific distribution hereunder.

3.3    **Professional Compensation and Reimbursement.** All requests for payment of Professional Compensation by the Debtor's counsel shall be filed in accordance with the Bankruptcy Code and Rules, subject to Bankruptcy Court approval after notice and a hearing. The Allowed Professional Compensation shall be paid by the Disbursing Agent from Available Cash promptly upon entry of an Order approving the same.

3.4     **Priority Claims**.  New York City has filed a proof of a priority tax claim in the amount of $92,307.20, based on an estimate of general corporate taxes due from the Debtor.  The Debtor disputes the claim, which will be paid in full if allowed by the Court.

3.5     **Bankruptcy Fees.**  The Debtor shall also pay all outstanding U.S. Trustee fees and charges assessed under 28 U.S.C. § 1930 together with any applicable interest due thereon until closing of this Chapter 11 case by means of a final decree.

## ARTICLE IV

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Except as otherwise provided in Article III, Allowed Claims are classified as set forth in this Article IV.  A Claim is in a particular Class designated herein only to the extent such Claim (i) fits within the description of such Class (and is in such other and different Class or Classes to the extent that the remainder thereof fits within the description of such other Class or Classes) and (ii) has not been paid, released or otherwise satisfied prior to the Effective Date.

**A.     Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Real Estate Tax Claims of the City of New York | Unimpaired | Not eligible to vote. |
| 2 | The DIP Loans of the DIP Lender | Unimpaired | Not eligible to Vote |
| 3 | The Pre-Petition Senior Mortgage Debt of VNB | Impaired | Eligible to Vote |
| 4 | General Unsecured Claims (including mechanic's liens, and claims of vendors and service providers) | Impaired | Eligible to Vote |
| 5 | Equity Interests | Unimpaired | Not Eligible to Vote (Insider) |

B.  **Treatment of Impaired Claims and Interests**

4.1  **Class 1 – Real Estate Tax Claims**. Class 1 consists of any outstanding and accrued real estate taxes owed to the City of New York or its assigns relating to the Property in the amount of $273,935.84.

**Treatment:** Class 1 Real Estate Tax Claims shall be paid in full on the Effective Date from Available Cash.

**Voting:** Class 1 Real Estate Tax Claims are not impaired and therefore not eligible to vote.

4.2  **Class 2 – Secured DIP Loans.** Class 2 consists of the DIP Loans in the principal sum of $7,980,631.74 as of April 18, 2023, plus all accrued and future interest and other charges in accordance with the DIP financing orders (ECF Nos. 42, 72, 112 and 173) and the underlying Debtor-in-Possession Loan Agreements, as amended.

**Treatment:** The Class 2 DIP Loans shall be paid in full from Available Cash on the Effective Date in accordance with the existing participation agreements between VNB and Churchill. The payment and satisfaction of the Class 2 DIP Loans shall have priority over the Class 3 Pre-Petition Secured Mortgage Debt held by VNB. It is the Debtor's view that Available Cash will exceed the Class 2 DIP Loans (regardless of whether the Debtor pursues the Sale or Refinancing).

**Voting**: The Class 2 DIP Loans are not impaired and therefore not eligible to vote.

4.3  **Class 3 – Pre-Petition Senior Mortgage Debt.** Class 3 consists of the Pre-Petition Mortgage Claim of VNB in the total amount of at least $17,667,972.51 arising out of the Debtor's pre- petition acquisition and construction loans made and issued by VNB.

**Anticipated Scenario No. 1 Sale Option:** VNB has authorized the Debtor to pursue the Sale in order to solicit the best possible third-party offer for the Property. The final decision to

accept an offer from a third-party buyer or to exercise credit bid rights belongs to VNB. VNB has already approved the Stalking Horse and will only credit bid in the unlikely event a third-party sale is not achieved. Accordingly, the Debtor shall proceed with the Sale option pursuant to 11 U.S.C. §§363(b) and (f) and 1123(a)(5). The closing on the Sale shall occur following entry of the Confirmation Order to allow the Debtor to benefit from all transfer tax exemptions under 11 U.S.C. §1146(a). In connection with a Sale, and in consideration for a release and/or assignment of the VNB Pre-Petition Senior Mortgage Debt, VNB shall be paid on the Effective Date all remaining Available Cash <u>after</u> the payments of (i) the Class 2 DIP Loans; (ii) Allowed Administrative Claims; (iii) Allowed Class 1 Real Estate Tax Claims; and (iv) the establishment of the General Creditor Fund. VNB has agreed to waive any deficiency claim resulting from the Sale and shall not share in the Creditor Fund.

The Sale shall be subject to the consent of VNB and the Master Tenant (such consent not to be unreasonably withheld), and subject to the assignment and further assumption of the Master Lease by a qualified buyer so as to preserve the Historic Tax Credits for the benefit of the Master Tenant. VNB and the Debtor shall not pursue a Sale in a manner that jeopardizes the Master Tenant's Historic Tax Credits.

**Scenario No. 2 Unlikely Refinancing Option:** At this point, the Refinancing of the existing DIP Loans and pre-petition mortgage debt with an institutional lender is extremely unlikely but remains as a failsafe. Thus, only to the extent applicable, if ever, any terms sheets, letters of intent, Refinancing proposals and/or commitments shall be submitted to VNB for its consideration although VNB has already made the election to have the Debtor proceed with the Sale option.

**Voting:**  VNB, as the Class 3 pre-petition mortgage lender is impaired and is eligible to vote, although VNB has already agreed to the Plan pursuant to the Term Sheet.

4.4    **Class 4 – General Unsecured Claims.** Class 4 consists of all General Unsecured Claims against the Debtor, including all mechanic's liens, and the claims of vendors and service providers and the Allowed Claim of Master Tenant in the sum of $201,585.30 arising from the Lease Assumption Order.  Because the Property likely has a current value of less than the total pre-petition and post-petition mortgage debt, any outstanding judgments and mechanic's liens are deemed fully undersecured and, therefore, are included as part of the Class 4 General Unsecured Claims.

**Treatment:**  The holders of Allowed Class 4 General Unsecured Claims shall receive a *pro rata* cash distribution from the General Creditor Fund.  The *pro rata* distribution shall be paid no later than forty (40) days after the Effective Date in full settlement of all Class 4 Claims.  If a Class 4 General Unsecured Claim is subject to an objection filed on or before the Claim Objection Date, then a separate reserve shall be established by the Disbursing Agent in an amount sufficient to pay the allocable pro rata share of the disputed Class 4 Claim, should such Claim become an Allowed Claim pursuant to Final Order or agreement with the Debtor.  The Debtor projects that Allowed Class 4 General Unsecured Claims (excluding any undersecured deficiency claims held) held by VNB will aggregate approximately $1,380,365 with a projected *pro rata* dividend of at least 18%, if not more, depending on the final claims reconciliation.

**Voting:**  The Class 4 creditors are impaired and eligible to vote on the Plan.

4.5    **Class 5 – Equity Interests**. Class 5 consists of all equity interests in Debtor.

**Treatment**:    The pre-petition equity and membership interests of Fabian Friedland in the Debtor are being cancelled.  In the event of a refinancing, Churchill, as the preferred equity holder

shall be the manager of the Reorganized Debtor and retain its ownership interest in the Debtor in the same proportion as prepetition in consideration of Churchill's facilitation of (i) the refinancing of the DIP Loan and pre-petition indebtedness; (ii) the payment of the refinanced indebtedness; and (iii) managing completion of the Project during the Chapter 11 case. In the anticipated absence of a refinancing, the treatment of equity interests and future management rights will be addressed in connection with the sale of the Property.

**Voting**: The Class 5 Equity Interest Holders are not eligible to vote as they are insiders of the Debtor.

## ARTICLE V

## IMPLEMENTATION OF THE PLAN

5.1     **Implementation.**  The Plan shall be implemented by the Debtor on a coordinated basis with VNB, Churchill and the Master Tenant based, in all likelihood, on the Sale option. Even before receipt of a Stalking Horse Contract, VNB has elected the Sale option.

5.2     **Sale Option.**  The parties shall cooperate in the implementation of a Sale, pursuant to agreed bid procedures which will govern the terms of an auction of the Property and provide for the payment of incentives to the stalking horse bidder, including a reasonable break-up fee to be paid from sale proceeds. The Debtor is formulating conventional bidding and sale procedures to conduct the auction sale of the Property based upon the Stalking Horse Contract (subject to assumption of the Master Lease and sale of the Property) pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5) free and clear of all claims, liens, taxes and interests (the "Sale Procedures"). Notwithstanding the foregoing, the Sale Procedures shall require that any acceptable bid include (1) recognition of the prior assumption of the Master Lease; (2) the assignment of the Master Lease to the buyer; and (3) non-disturbance of the Master Lease for the remainder of the HTC

Compliance Period, including by any lender providing debt in connection with such Sale. Final approval of a Sale shall be sought in conjunction with hearings to confirm the Plan, with a closing to occur following entry of the Confirmation Order.

5.3     **Unlikely Refinancing Option.**  In the most unlikely event that the Refinancing Option becomes necessary (which again is not anticipated since VNB has announced it will credit bid if necessary), the parties shall cooperate in the negotiation, drafting and execution of applicable loan documents as required by the exit lender (the "Mortgage Loan Documents") including a subordination agreement and agreement to modify the terms of the VNB prepetition indebtedness in in form and substance reasonably acceptable to VNB which will provide for subordination of any deficiency owed in connection with VNB's prepetition indebtedness and modification of the terms thereof (the "Subordination Agreement" and together with the Mortgage Loan Documents, the "Loan Documents"). The Loan Documents shall provide for the refinancing of the DIP Loan, payment of some or all of VNB's pre-petition indebtedness, and payment of administrative, priority and general unsecured claims as provided herein. The Loan Documents shall also provide for the preservation of the Historic Tax Credits and recognize the assumption of the Master Lease, which will be accomplished by lender entering into a Subordination, Non-Disturbance and Attornment Agreement acceptable to Master Tenant that provides, in part, non-disturbance of the Master Lease and prohibition against certain actions that could reasonably result in a recapture of the Historic Tax Credits, in each case for the duration of the HTC Compliance Period.

5.4     **Transfer Tax Exemption.**  To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, the sale and/or refinancing of the Property shall be exempt from the payment of transfer, stamp, deed, mortgage recording or similar taxes, since all of the transactions are being

done, and constitute a "transfer under and in furtherance of a confirmed plan of reorganization" in bankruptcy.

5.5 **Delivery of Distributions.** The distributions to the holders of Allowed General Unsecured Claims shall be forwarded: (i) to the address set forth on any allowed Proof of Claim filed, or (ii) at the addresses reflected in the Debtor's Bankruptcy Schedules. If a distribution to any Creditor is returned as undeliverable without a forwarding address, no further distributions to such Creditor shall be made. All claims for undeliverable distributions shall be made on or before the 180th day after the first distributions under the Plan. All unclaimed dividends by a Creditor shall revert to the Debtor.

5.6 **Procedures for Treating and Resolving Disputed Claims**. No payments or distributions shall be made with respect to any portion of a Disputed Claim unless and until objections to any Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim in whole or in part. In the interim, the Disbursing Agent shall establish an appropriate reserve (the "Disputed Claim Reserve") for all Disputed Claims pending resolution thereof. Payments from the Disputed Claim Reserve shall be paid when and if the Disputed Claim becomes an Allowed Claim in whole or in part. Following completion of the claim objection process, any unused portion of the Disputed Claim Reserve shall revert to the Debtor.

5.7 **Post-Confirmation Stays/Injunctions.** All stays pursuant to Section 362 of the Bankruptcy Code shall remain in full force and effect until the close of the bankruptcy case and entry of a Final Decree. All Creditors who hold, have held, or may hold a Claim or Claims against the Debtor are permanently enjoined on and after the Confirmation Date from (i) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such

Claim; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Property; (iii) creating, perfecting or enforcing any encumbrance of any kind against the Property; and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Property.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1 **Disposition of the Master Lease**.  A key component of the Term Sheet and this Plan has already been achieved through the assumption and continuation of the Master Lease for the remainder of the HTC Compliance Period.  In addition to the Master Tenant's Conditions set forth in Article I above, the Term Sheet also required that in the event of a either a Sale or Refinance, the acceptable third-party buyer (or Debtor in the event of a refinance) shall enter into an amended and restated Master Lease (the "Amended Master Lease") in form necessary to preserve all Historic Tax Credits.  The Amended Master Lease shall confirm that (a) there are no defaults to be cured; (b) the Master Tenant is not liable for any pre-assumption rent arrears, with the Master Tenant deemed to have paid rent (and Debtor deemed to have received rent) for all periods prior to the date of the entry of an Order approving the assumption of the Master Lease based upon collection of available cash from prior operations of the Property; (c) confirm that all subleases with end-user tenants are entered into by the Master Tenant, as Landlord; all as delineated in the Master Tenant Assumption and Assignment Agreement that is attached to this Plan as Exhibit "A"; and (d) a Subordination, Non-Disturbance and Attornment Agreement that provides, amongst other things, for non-disturbance of the Master Lease for the duration of the HTC Compliance Period.  Additionally, the Amended Lease and related amendments to the Master Tenant's operating documents shall provide valuable consideration to the bankruptcy estate by (i)

setting forth a post-assumption rent owed by Master Tenant to Debtor (or its successor) under the Master Lease equal to available net cash flow of the Master Tenant after payment of its operating expenses as the operator of the Property under the Master Lease; (ii) provide that amendments to the Master Tenant's operating documents shall be made as necessary to admit an affiliate of the Debtor (or an affiliate of any buyer of the Property) as the managing member of the Master Tenant, with the rights and obligations necessary to protect the Historic Tax Credits; and (iii) reducing previously negotiated cash requirements of HTC Investor, including priority return and certain other economics owed to HTC Investor. The foregoing additional consideration contemplated by the Term Sheet is valuable to the Debtor's estate because it constitutes a waiver by Master Tenant of the HTC Investor's bargained for economic returns, including its annual priority return throughout the HTC Compliance Period and its exit payment at the end of the HTC Compliance Period.

6.2    **Disposition of Other Executory Contracts and Unexpired Leases**.  All other executory contracts and unexpired residential and commercial leases not previously assumed or rejected by the Debtor pursuant to Bankruptcy Court Order or this Plan shall be deemed assumed as of the Effective Date. Any defaults with respect to the residential apartment leases or subleases shall be addressed by the Debtor or the acceptable third-party buyer in the regular course of business without any further proceedings in the Bankruptcy Court or specific distributions under the Plan.

## ARTICLE VII

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

7.1    **Conditions to the Effectiveness of the Plan**.  Confirmation and the occurrence of the Effective Date shall be conditioned upon (i) the amendment of the Master Lease described in

Section 6., together with the Master Tenant's Conditions set forth in Article I above and the Property obtaining all requisite TCOs for Master Tenant to operate and lease the Property,; (ii) entry of the Confirmation Order; and (iii) approval of a Sale or Refinancing either in conjunction with confirmation of the Plan or pursuant to separate motion; notwithstanding the foregoing, and unless waived in writing by VNB, the Plan shall not become effective until at least one of the following shall have occurred:  (x) a stalking horse bid satisfactory to VNB or credit bid by VNB shall have been received and a motion to approve that bid and a Sale pursuant thereto shall have been filed, or (y) a refinance bid satisfactory to VNB shall have been received.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

8.1    **Binding Effect of the Plan**.  The provisions of the Plan shall be binding upon all parties and inure to the benefit of the Debtor's estate and all of its creditors, successors and assigns.

8.2    **Retention of Jurisdiction.**  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain continuing jurisdiction for the following purposes:

> To allow, disallow, determine, liquidate, classify, estimate, or establish the treatment of any Claim;
>
> To decide and determine all matters related to the granting and denying, in whole or in part, of any Professional Compensation;
>
> To decide any dispute relating to the sale or refinancing of the Property prior to a closing thereon;
>
> To adjudicate any motions, adversary proceedings, applications or contested matters that may be pending on the Effective Date;
>
> To enter and implement such Orders as may be necessary or appropriate to execute, implement, enforce or consummate the provisions of the Plan, and the distributions hereunder;

> To adjudicate any and all disputes arising from or relating to the Plan or any transactions contemplated herein;
>
> To consider any modifications of the Plan to cure any defect or omission, or to reconcile any inconsistency with the Confirmation Order; and
>
> To enter the Final Decree concluding and closing these bankruptcy cases.

8.3    **Headings**.  The headings of the Sections and subparagraphs of the Plan are inserted for convenience only and shall not affect the interpretation of any provision of the Plan.

8.4    **Time**.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day that is not a business day, then the time for the next occurrence or happening of said event shall be extended to the next day business.

8.5    **Confirmation Order Controls**.  In the event any provision of the Plan is inconsistent with the specific provisions of the Confirmation Order, the Confirmation Order shall control and take precedence over the general provisions of the Plan.

8.6    **Statutory Fees**.  The Disbursing Agent shall pay any accrued U.S. Trustee Fees through the entry of the Final Decree.

8.7    **Resolution of Claims Among the Principal Parties.**  Upon confirmation of the Plan, each of VNB, the Tenant, the Debtor and its members, and the DIP Lenders, and the respective agents and professionals of each of them, shall release and discharge all claims against each other arising from the conduct of each or any of them, including any claim arising from any alleged violation of Section 362 of the Bankruptcy Code.  For the avoidance of doubt this provision does not release (i) contractual obligations, including without limitation, amounts due for rent or any loan principal or interest due, and (ii) amounts approved by the Bankruptcy Court for professional fees to be paid by the Debtor under this Plan.

Dated: New York, NY
      January 4, 2024

| Nassau Brewing Company Landlord LLC | Goldberg Weprin Finkel Goldstein LLP |
| --- | --- |
| | Attorneys for the Debtor |
| | 125 Park Avenue, 12th Floor |
| | New York, NY 10017 |
| By:   /s/ Sean Rucker | By: /s/ Kevin J. Nash, Esq. |