UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                     Chapter 11

Nassau Brewing Company Landlord LLC,                        Case No.  21-41852-JMM

                                        Debtor.
--------------------------------------------------------x

## DEBTOR'S DISCLOSURE STATEMENT

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE DEBTOR'S PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT YET BEEN APPROVED.  ACCORDINGLY, THE DISCLOSURE STATEMENT CANNOT BE DISSEMINATED OR RELIED UPON UNLESS AND UNTIL THE SAME HAS ACTUALLY BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT.

With a sales contract having been executed with a stalking horse bidder, Nassau Brewing Company Landlord LLC (the "Debtor") has filed a revised Chapter 11 plan of reorganization (as may be amended, modified or supplemented, the "Plan") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") contemporaneously herewith.  The Plan sets forth the manner in which claims against and interests in the Debtor will be treated and paid in bankruptcy based upon the anticipated sale of the Debtor's property located at 945 Bergen Street, Brooklyn, NY (the "Property") and distribution of proceeds.

In connection with the Plan, the Debtor hereby submits this Disclosure Statement pursuant to 11 U.S.C. §1125 (as may be amended, modified or supplemented, the "Disclosure Statement") in support of the Plan to all known holders of Claims against, or Interests in the Debtor in order to adequately disclose information deemed to be material, important and necessary for creditors to make a reasonably informed decision concerning acceptance or rejection of the Plan.  **Unless otherwise defined, all capitalized terms have the meaning ascribed to them in the Plan.**

## I.    INTRODUCTION

### A.    Background

The Debtor sought Chapter 11 relief to complete a residential redevelopment of the Property (the "Project") in the aftermath of mismanagement by the Debtor's prior managing member, Fabian Friedland, and despite the challenges presented by Covid-19.  The Debtor's redevelopment project was further complicated by the requirements of a pre-existing Master Lease (defined below) executed with Nassau Brewing Company Master Tenant LLC ("Master Tenant"). The Master Lease is designed to preserve the pass-through of certain federal and state historic tax credits ("Historic Tax Credits") to the Master Tenant and allocation of such Historic Tax Credits to Master Tenant's 99% limited investor partner, an affiliate of JPMorgan Chase.  To say that the requirements and obligations created under the Master Lease are complicated is an understatement. However, because maintaining the Master Lease structure represents an important revenue source for the Debtor, the Debtor has worked closely with Master Tenant to assure that the Master Lease remains in place as part of a global settlement  reached with the Debtor's senior pre-petition lender, Valley National Bank ("VNB"), to sell or refinance the Property pursuant to the Plan.

By the time of the Chapter 11 filing, affiliates of Churchill Real Estate Holdings LLC (CF-IF-2020-1 LLC ("Churchill") had ousted Mr. Friedland for cause and assumed control of the Debtor's management based upon its status as a preferred equity holder.  Churchill, in turn, pursued negotiations with VNB to jointly provide necessary DIP financing to finish the Project.  Mr. Friedland was replaced by Churchill's designee, Sean Rucker.  The DIP financing was funded by VNB and Churchill on a 50-50% basis and provided the liquidity to complete construction and began leasing apartment units.

Over the last eight months, the Debtor, VNB and the Master Tenant entered into very complex negotiations regarding a global exit strategy that maximized value of the Property while preserving the integrity of the Master Lease.  The Plan carried forward the terms of the global settlement and was filed in contemplation of executing a sales contract with Goose Property Management LLC (the "Stalking Horse") to sell the Property for $18.25 million.  The stalking horse contract has been extensively drafted, reviewed and updated and was finally executed on January 3, 2024.  The Debtor is proceeding with a motion to approve the Stalking Horse and related bid procedures.

Based on an $18.25 million purchase price, plus the separate contribution of the Master Tenant of up to $3.5 million, it is contemplated that there will be sufficient funds to pay administrative expenses, priority taxes, real estate taxes and the DIP loan in full, plus establish a general creditor fund in the sum of $250,000 to pay a *pro rata* distribution (projected to be approximately 15-18% and perhaps higher) to general unsecured creditors and mechanics' lienholders.  The balance of the sale proceeds will be used to pay VNB on account of its pre-petition mortgage debt.  VNB is cooperating with the proposed sale even though its pre-petition secured claim in the principal sum of at least $17,667,972 will not be satisfied in full.

### B.    The Scope of this Disclosure Statement

This Disclosure Statement has been prepared by the Debtor in consultation with its attorneys.  The Disclosure Statement has been approved by the Bankruptcy Court as containing adequate information within the meaning of 11 U.S.C. §1125.  The Bankruptcy Court's approval of the Disclosure Statement, however, does not constitute an endorsement of the Plan.  Instead, creditors are urged to review the Plan in its entirety before voting or deciding to object.

### C.    The Confirmation Hearing

The Bankruptcy Court has entered an Order (the "Scheduling Order") approving this Disclosure Statement and scheduling a hearing to consider confirmation of the Plan on _____ __, 2024 at __:__ _.m., prevailing New York Time (the "Confirmation Hearing").  A copy of the Scheduling Order accompanies the Plan and this Disclosure Statement, and creditors are advised to review carefully the dates and deadlines contained therein for voting and objections.

The Confirmation Hearing will be conducted before the Honorable Jil Mazer-Marino, of the United States Bankruptcy Court, 271 Cadman Plaza East, Brooklyn, New York 11201.  The hearing will be conducted on the Zoom platform using **eCourt Appearances**. Attorneys with a CM/ECF account may find the program under the "Utilities" menu after logging on to CM/ECF. Those without CM/ECF accounts may access the program on the website at **https://ecf.nyeb.uscourts.gov/cgi-bin/nyebAppearances.pl.**  The Confirmation Hearing may be adjourned from time to time without further notices other than by announcement at the Confirmation Hearing.  Any objection to confirmation of the Plan must be in writing, must be filed with the Bankruptcy Court no later than _____, 2024.

At the hearing, the Bankruptcy Court shall determine whether the requirements of Section 1129(a) or (b) of the Bankruptcy Code have been satisfied in order to permit confirmation and approval of the Plan.  Bankruptcy Court approval and confirmation of the Plan makes the Plan binding upon the Debtor and all of the Debtor's creditors and other parties-in-interest.

### D.    Voting

For the Plan to be accepted on a consensual basis, all impaired classes of creditors must vote to accept the Plan or be deemed to accept the Plan as a matter of law. In this instance, the Class 3 pre-petition senior mortgage debt held by VNB and the Class 4 claims of general unsecured

creditors (including mechanic's liens and claims of vendors and service providers) are impaired and eligible to vote. A ballot is being provided with this Disclosure Statement and a copy of the Plan. The Ballot and should be completed and returned before the voting deadline by either overnight mail or email to Goldberg Weprin Finkel Goldstein LLP, Attn: Kevin J. Nash, 125 Park Avenue, 12th Floor, New York, New York 10017. E-mail: KNash@GWFGlaw.com. In order to be considered, a ballot must be actually received on or before _____, 2024 at 5:00 p.m. (prevailing New York time) (the "Voting Deadline").

## II.    DISCLAIMERS

**ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON PROJECTIONS AND ASSUMPTIONS.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTOR AND THE EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE, ARE BASED UPON THE DEBTOR'S GOOD FAITH ANALYSIS OF THE MATTERS IN QUESTION. NEITHER THE DEBTOR NOR ANY OTHER PARTY MAKE ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.**

**THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

## III.    SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS

The table below briefly summarizes the specific classification and treatment of Claims and Interests under the Plan. As provided in the Plan, U.S. Trustee Fees and Administrative Expense Claims, including Professional Fee Claims, have not been classified as permitted by Section 1123(a)(1) of the Bankruptcy Code:

| Class | Type of Claim or Interest | Treatment | Estimated Amount of Total Claims (By Class) | Potential Recovery |
|---|---|---|---|---|
| N/A | U.S. Trustee Fees | All outstanding fees and charges assessed against the Debtors under 28 U.S.C. § 1930 and any applicable interest due thereon shall be paid on the Effective Date. | TBD | 100% |
| N/A | Professional Fee Claims | Applications of Professionals seeking final compensation shall be filed no later than thirty (30) days after the Effective Date. | Projected to be capped at $225,000 (net of retainers) | 100% |
| N/A | Priority Tax Claims | New York City has filed a proof of a priority tax claim in the amount of $92,307.20, based on an estimate of general corporate taxes due from the Debtor.  The Debtor disputes the claim, which will be paid in full if allowed by the Court. | TBD | 100% |
| 1 | Real Estate Tax Claims of the City of New York | Outstanding and accrued real estate taxes owed to the City of New York or its assigns relating to the Property to be paid in full at closing on sale or refinancing. | $273,935.84 | 100% |
| 2 | The DIP Loans of the DIP Lender | DIP Loans to be paid in full at closing from proceeds of sale, part of credit bid or refinancing. | $7,980,631.74, plus interest and other charges | 100% |
| 3 | The Pre-Petition Senior Mortgage Debt of VNB | Pre-Petition Mortgage Claim of VNB.  To be paid (i) at closing from proceeds of sale, part of credit bid or refinancing, and (ii) from monies paid by the Master Tenant under the global settlement | $17,667,972.51 | Up to 100%, but projected to be approximately 70% |
| 4 | General Unsecured Claims (including mechanic's liens, and claims of vendors and service providers) | Pro rata distribution of general creditor fund of $250,000 to be established at closing from proceeds of sale, part of credit bid or refinancing. For purposes of the Plan, VNB is waiving any distribution on account of its deficiency claim. | $1,561,949.87, subject to reconciliation and objection | 15-18% |
| 5 | Equity Interests | | N/A | N/A |

## IV.    EVENTS LEADING TO THE CHAPTER 11 PLAN

### A.    The DIP Loans

The initial phases of the Chapter 11 case revolved around obtaining approval of debtor-in-possession financing.  On August 23, 2021, the Debtor filed its initial motion for approval of a total loan in the sum of $4,450,000 to fund a completion capital budget [ECF no. 26].  The motion was initially objected to by the Master Tenant on the ground that the Master Tenant retained purported lien rights relating to the Property.  The objection was overruled by the Bankruptcy Court without prejudice to the rights of the Master Tenant, which entered interim and final orders approving the requested DIP financing on September 20, 2021 [ECF No. 42] and January 27, 2022 [ECF No. 72], respectively.  The DIP loan was jointly funded by VNB and Churchill pursuant to a series of new loan agreements signed by the Debtor.  The amount of the DIP loan was increased and supplemented pursuant to a new set of interim and final orders entered on June 17, 2022 [ECF No. 107] and August 1, 2022 [ECF No. 112], respectively.  Based upon the increase, the Debtor's total DIP borrowings aggregate to $7,980,631.74, which constitutes a first priority lien claim against any sale or refinancing proceeds subject to carve-out.

### B.    Global Settlement with VNB and Master Tenant

During the Chapter 11 case, VNB came to the realization that its pre-petition secured debt would not be paid in full, and engaged a broker without the Debtor's consent or Bankruptcy Court approval.  The Debtor moved to find VNB in violation of the automatic stay.  The Court found a stay violation and scheduled a subsequent hearing to address damages.  After March 23, 2023, VNB retained new counsel and the Debtor ultimately settled the matter with VNB pursuant to a Consent Order dated June 8, 2023 [ECF No. 174] without any sanctions or damages.  The Consent Order was part of the global settlement negotiations between the Debtor, VNB and the Master

Tenant regarding a mutually acceptable exit strategy.  With the parties at an impasse, the Court ordered mediation in February 2023.  The mediation proved to be an incentive to facilitate the global settlement memorialized by a term sheet dated April 19, 2023.  The term sheet established the blueprint for the current Plan, including the "toggle" features of first pursuing a sale of the Property and then toggling, or switching over, as necessary, to a refinance of the Property if a buyer did not emerge or VNB elected not to credit bid.  The term sheet also set into motion the Debtor's motion to assume the Master Lease under any circumstances.  A detailed motion to assume the Master Lease was prepared by the Debtor and the Master Tenant on August 2, 2023 [ECF No. 185] laying out the history and intricacies of the Master Lease in juxtaposition to the legal requirements to preserve historic tax credits.  The motion to assume the Master Lease was granted by the Bankruptcy Court pursuant to Order dated September 13, 2023 [ECF No. 200].  As a result, any sale or refinance of the Property under the Plan or otherwise remains subject to the Master Lease.

### C.    Efforts to Sell the Property

The current goal of the Chapter 11 case is to proceed with a sale of the Property.  Although the Plan continues to provide a possible but highly unlikely toggle for a potential refinancing. VNB has selected the Sale Option for the Property.  Accordingly, there are no pending efforts to obtain refinancing and none are contemplated.  Thus, for historical purposes, the Plan continues to retain a toggle, but it is not anticipated to ever occur.  If a third-party sale does not materialize, VNB has indicated it will credit bit for the Property.  Thus, the Debtor shall complete the various items necessary to obtain a Temporary Certificate of Occupancy ("TCO"), all as outlined in the Debtor's status letter dated October 3, 2023 [ECF No. 202].  The Debtor previously retained Cushman & Wakefield Realty of Brooklyn as its broker pursuant to Bankruptcy Court Order dated

July 5, 2023 [ECF No. 185].  The Broker obtained multiple offers before the parties settled on the Stalking Horse's proposal to purchase the Property for $18.25 million.  The Debtor has entered into a contract with the Stalking Horse that is subject to competitive bidding and is contingent primarily upon the Debtor obtaining a TCO, Bankruptcy Court approval and removal of a restriction dating back a decade.  The Debtor has consulted with the existing contractors to complete the necessary work to obtain a TCO, which primarily involves installing a vapor shield through the subbasement and replacing several windows.  The total cost of completion of such work is projected to be approximately $771,058, which shall be funded from monies on deposit in the Debtor's DIP accounts.  All work remains subject to the consent and approval of VNB, including all final budgets and a stipulation with VNB for the continued use of cash collateral to cover the expenses associated with obtained a TCO and filing the Debtor's tax returns.

### D.    Mechanic's Liens

Several contractors filed proofs of claim based on mechanic's liens totaling $1,133,646.04 The Debtor and VNB view that all mechanic's liens are fully undersecured and, therefore, for purposes of the Plan are treated as Class 5 general unsecured claims entitled to share in the *pro rata* distribution from the general creditor fund of $250,000.

## V.    SUMMARY OF THE PLAN OF REORGANIZATION

### A.    Summary

The Plan is the culmination of these discussions and contemplates in the first instance a sale of the Property (either directly or by credit bid by VNB or through a transfer of membership interests of the Debtor, in each circumstances in a manner that preserves the Historic Tax Credits) (hereinafter the "Sale") or, if a sale fails, a refinancing of the existing DIP Loan and Senior Mortgage Debt (the "Refinancing").  In both instances, the Historic Tax Credits shall be preserved

throughout the period commencing on the date of the last "qualified rehabilitation expenditure" for the Historic Tax Credits (i.e., December 31, 2022) and ending on the 5-year anniversary thereof (i.e., December 31, 2027) (the "HTC Compliance Period").

The decision on whether to "toggle" from a Sale to Refinancing shall be made by VNB. At this juncture, however, VNB has decided to proceed with the sale of the Property to the Stalking Horse or to any higher or better offer at an auction. If need be, VNB is also prepared to credit bid on the Property, making a Refinancing a most unlikely option.

To re-emphasize, the Debtor's prior assumption of the existing Amended and Restated Master Lease Agreement dated December 21, 2018 (as amended, the "Master Lease") between Debtor, as landlord, and the Master Tenant (an entity that is 99% owned by Chase Community Equity, LLC, as the Historic Tax Credit investor (the "HTC Investor")), as master tenant, pursuant to Order dated September 13, 2023 (the "Lease Assumption Order") shall remain in place under any scenario. In consideration for preservation of the Historic Tax Credits in the manner described in this Plan, and subject to the Property obtaining a TCO to enable and permit the Master Tenant to operate and lease the Property, the Master Tenant shall pay the Debtor's estate the sum of $3.5 million (as may be adjusted) to help fund the Debtor's obligations under the Plan. Payments by the Master Tenant are contingent upon: (1) completion of 2021 and 2022 tax returns for the Debtor, including the pass-through election relating to the Historic Tax Credits to be filed as part of the 2022 tax returns for the Debtor, as reviewed and approved by Master Tenant, (2) completion of the final "cost certification" from Cohn Reznick LLP for the Historic Tax Credits (the "HTC Cost Certification"), with certified Historic Tax Credit eligible "qualified rehabilitation expenditures" of at least the amount shown in the draft "cost certification" provided to the Master Tenant, and (3) finalization and execution of the Master Tenant Assignment and Assumption Agreement that

is contemplated by the Lease Assumption Order (collectively, the "Master Tenant's Conditions"). The cost certification has been completed and the Master Tenant Assignment and Assumption agreement has been executed and is being held in escrow but still requires additional documentation to be attached before this condition is fully satisfied.

### B. Unclassified Claims.

Pursuant to § 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Claims or Priority Tax Claims, which shall be paid in full.

**Administrative Claims.**  Each Administrative Claim, to the extent not previously paid, shall be paid by the Disbursing Agent in full on the later of (i) the Effective Date; (ii) five (5) business days after such Administrative Claim becomes an Allowed Claim; or (iii) a date that may be otherwise mutually agreed in writing between the Disbursing Agent and the holder of such Administrative Claim; provided, however, that any Administrative Claim incurred by the Debtor in its ordinary course of its business shall be paid in accordance with the parties' underlying terms and conditions without receiving a specific distribution hereunder.  The Debtor does not anticipate that there will be any unpaid Administrative Claims after the TCO is obtained.

**Professional Compensation and Reimbursement.**  All requests for payment of Professional Compensation by the Debtor's counsel shall be filed in accordance with the Bankruptcy Code and Rules, subject to Bankruptcy Court approval after notice and a hearing.  The Allowed Professional Compensation shall be paid by the Disbursing Agent from Available Cash promptly upon entry of an Order approving the same.  The Debtor projects that its counsel's fees will total approximately $225,000 net of the retainer.

**Priority Claims**.  New York City has filed a proof of a priority tax claim in the amount of $92,307.20, based on an estimate of general corporate taxes due from the Debtor.  The Debtor disputes the claim, which will be paid in full if allowed from Available Cash.

**Bankruptcy Fees.**  The Debtor shall also pay all outstanding U.S. Trustee fees and charges assessed under 28 U.S.C. § 1930 together with any applicable interest due thereon until closing of this Chapter 11 case by means of a final decree.

### C.  Classification and Treatment of Claims and Interests

Except as otherwise provided in Article III, Allowed Claims are classified as set forth in this Article IV.  A Claim is in a particular Class designated herein only to the extent such Claim (i) fits within the description of such Class (and is in such other and different Class or Classes to the extent that the remainder thereof fits within the description of such other Class or Classes) and (ii) has not been paid, released or otherwise satisfied prior to the Effective Date.

### 1.        Classes of Claims and Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Real Estate Tax Claims of the City of New York | Unimpaired | Not eligible to vote. |
| 2 | The DIP Loans of the DIP Lender | Unimpaired | Not eligible to Vote |
| 3 | The Pre-Petition Senior Mortgage Debt of VNB | Impaired | Eligible to Vote |
| 4 | General Unsecured Claims (including mechanic's liens, and claims of vendors and service providers) | Impaired | Eligible to Vote |
| 5 | Equity Interests | Unimpaired | Not Eligible to Vote (Insider) |

### 2.        Treatment of Impaired Claims and Interests

**Class 1 – Real Estate Tax Claims**.  Class 1 consists of any outstanding and accrued real estate taxes owed to the City of New York or its assigns relating to the Property in the amount of $273,935.84.

**Treatment:** Class 1 Real Estate Tax Claims shall be paid in full on the Effective Date from Available Cash.

**Voting:** Class 1 Real Estate Tax Claims are not impaired and therefore not eligible to vote.

**Class 2 – Secured DIP Loans.** Class 2 consists of the DIP Loans in the principal sum of $7,980,631.74 as of April 18, 2023, plus all accrued and future interest and other charges in accordance with the DIP financing orders (ECF Nos. 42, 72, 112 and 173) and the underlying Debtor-in-Possession Loan Agreements, as amended.

**Treatment:** The Class 2 DIP Loans shall be paid in full from Available Cash on the Effective Date in accordance with the existing participation agreements between VNB and Churchill. The payment and satisfaction of the Class 2 DIP Loans shall have priority over the Class 3 Pre-Petition Secured Mortgage Debt held by VNB. It is the Debtor's view that Available Cash will exceed the Class 2 DIP Loans (regardless of whether the Debtor pursues the Sale or Refinancing).

**Voting**: The Class 2 DIP Loans are not impaired and therefore not eligible to vote.

**Class 3 – Pre-Petition Senior Mortgage Debt.** Class 3 consists of the Pre-Petition Mortgage Claim of VNB in the total amount of at least $17,667,972.51 arising out of the Debtor's pre- petition acquisition and construction loans made and issued by VNB.

**Scenario No. 1 Sale Option:** VNB has authorized the Debtor to pursue the Sale in order to solicit the best possible third-party offer for the Property. The final decision to accept an offer from a third-party buyer or to exercise credit bid rights belongs to VNB. Once the Stalking Horse Contract is executed, the Debtor shall proceed with the Sale pursuant to 11 U.S.C. §§363(b) and (f) and 1123(a)(5). The closing on the Sale shall occur following entry of the Confirmation Order to allow the Debtor to benefit from all transfer tax exemptions under 11 U.S.C. §1146(a). In

connection with a Sale, and in consideration for a release and/or assignment of the VNB Pre-Petition Senior Mortgage Debt, VNB shall be paid on the Effective Date all remaining Available Cash after the payments of (i) the Class 2 DIP Loans; (ii) Allowed Administrative Claims; (iii) Allowed Class 1 Real Estate Tax Claims; and (iv) the establishment of the General Creditor Fund. VNB has agreed to waive any deficiency claim resulting from the sale.

The Sale shall be subject to the consent of VNB and the Master Tenant (such consent not to be unreasonably withheld), and subject to the assignment and further assumption of the Master Lease by a qualified buyer so as to preserve the Historic Tax Credits for the benefit of the Master Tenant.  VNB and the Debtor shall not pursue a Sale in a manner that jeopardizes the Master Tenant's Historic Tax Credits.

**Scenario No. 2 Refinancing Option:**  As a highly unlikely failsafe, the Plan also provides for a toggle to a Refinancing of the existing DIP Loans and pre-petition mortgage debt with an institutional lender reasonably acceptable to VNB.    VNB has indicated that the Refinancing is a vestige of the term sheet relating to the global settlement and VNB shall credit bid rather than accept a Refinancing Option.  If the situation changes, any and all terms sheets, letters of intent, Refinancing proposals and/or commitments shall be submitted to VNB for its consideration and approval.

**Voting:**  VNB, as the Class 3 pre-petition mortgage lender is impaired and is eligible to vote, although VNB has already agreed to the Plan pursuant to the Term Sheet.

**Class 4 – General Unsecured Claims.** Class 4 consists of all General Unsecured Claims against the Debtor, including all mechanic's liens, and the claims of vendors and service providers and the Allowed Claim of Master Tenant in the sum of $201,585.30 arising from the Lease

Assumption Order.  There are five potential mechanic's lien claims totaling $932,050.74.[1]  These liens are undersecured and remain subject to reconciliation and distribution objection.  Because the Property has a current value of less than the total pre-petition and post-petition mortgage debt, all outstanding mechanic's liens are deemed fully undersecured and, therefore, are included as part of the Class 4 General Unsecured Claims.

**Treatment:**  The holders of Allowed Class 4 General Unsecured Claims shall receive a *pro rata* cash distribution from the General Creditor Fund projected to be around 15-18%, and perhaps a little higher if the mechanic's liens are reduced.  The *pro rata* distribution shall be paid no later than forty (40) days after the Effective Date in full settlement of all Class 4 Claims.  If a Class 4 General Unsecured Claim is subject to an objection filed on or before the Claim Objection Date, then a separate reserve shall be established by the Disbursing Agent in an amount sufficient to pay the allocable pro rata share of the disputed Class 4 Claim, should such Claim become an Allowed Claim pursuant to Final Order or agreement with the Debtor.

**Voting:**  The Class 4 creditors are impaired and eligible to vote on the Plan.

**Class 5 – Equity Interests**.  Class 5 consists of all equity interests in Debtor.

**Treatment**:    The pre-petition equity and membership interests of Fabian Friedland in the Debtor are being cancelled.  In the event of a refinancing, Churchill, as the preferred equity holder shall be the manager of the Reorganized Debtor and retain its ownership interest in the Debtor in the same proportion as prepetition in consideration of Churchill's facilitation of (i) the refinancing of the DIP Loan and pre-petition indebtedness; (ii) the payment of the refinanced indebtedness; and (iii) managing completion of the Project during the Chapter 11 case.  In the anticipated absence

---

[1] Four of the lienors filed proofs of claim.  The fifth, Vital Plumbing Inc,. which filed a lien in the amount of $463,049.71, did not file a proof of claim and will be the subject of an objection on that ground as well.

of a refinancing, the treatment of equity interests and future management rights will be addressed in connection with the sale of the Property.

**Voting**:  The Class 5 Equity Interest Holders are not eligible to vote as they are insiders of the Debtor.

### D.    Implementation of the Plan

**Implementation.**   The Plan shall be implemented by the Debtor on a coordinated basis with VNB, Churchill and the Master Tenant based in the first instance on a sale of the Property. While Refinancing is still remotely possible, a sale is the preferred and best alternative and has gained momentum with the prospect of the Stalking Horse Contract.

**Sale Option.**   To date, the parties have cooperated in acquiring the Stalking Horse Contract.  Absent VNB's decision to pursue a sale without a stalking horse bidder, the Sale Procedures (defined below) will outline the terms of an auction of the Property.  With or without the Staking Horse Contract, the Debtor shall formulate conventional bidding and sale procedures to conduct the auction sale of the Property pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5) free and clear of all claims, liens, taxes and interests except for the assumed Master Lease (the "Sale Procedures").  Notwithstanding the foregoing, the Sale Procedures shall require that any acceptable bid include (1) recognition of the prior assumption of the Master Lease; (2) the assignment of the Master Lease to the buyer; and (3) non-disturbance of the Master Lease for the remainder of the HTC Compliance Period, including by any lender providing debt in connection with such Sale.  Final approval of a Sale shall be sought in conjunction with hearings to confirm the Plan, with a closing to occur following entry of the Confirmation Order.  Based upon a sale to the Stalking Horse, the Debtor projects the following sources and uses of cash:

| Sources and Uses of Cash | |
|---|---|
| Revenue | |
| Sale proceeds | $18,250,000.00 |
| Master Tenant Payment (subject to adjustment) | $3,500,000.00 |
| Total Revenue | $21,750,000.00 |
| Disbursements | |
| Closing Costs (Broker Commissions) | $273,750.00 |
| Closing Costs (Other) | $15,000.00 |
| Administrative (Professional Fees) | $225,000.00 |
| Priority Tax Claims | $92,307.20 |
| U.S. Trustee Fees | $174,000.00 |
| Class 1 - Real Estate Taxes | $273,935.84 |
| Class 2 - DIP Loans (plus interest) | $7,980,631.74 |
| Class 4 - General Unsecured | $250,000.00 |
| Balance to Class 3 - Pre-petition Mortgage | $12,465,375.22 |

**Refinancing Option.**  In the most unlikely event that the Refinancing Option becomes necessary (which again is not anticipated since VNB has announced it will credit bid), the parties shall cooperate in the negotiation, drafting and execution of applicable loan documents as required by the exit lender (the "Mortgage Loan Documents") including a subordination agreement and agreement to modify the terms of the VNB prepetition indebtedness in in form and substance reasonably acceptable to VNB which will provide for subordination of any deficiency owed in connection with VNB's prepetition indebtedness and modification of the terms thereof (the "Subordination Agreement" and together with the Mortgage Loan Documents, the "Loan Documents").  The Loan Documents shall provide for the refinancing of the DIP Loan, payment of some or all of VNB's pre-petition indebtedness, and payment of administrative, priority and general unsecured claims as provided herein.  The Loan Documents shall also provide for the preservation of the Historic Tax Credits and recognize the assumption of the Master Lease, which will be accomplished by lender entering into a Subordination, Non-Disturbance and Attornment Agreement acceptable to Master Tenant that provides, in part, non-disturbance of the Master Lease

and prohibition against certain actions that could reasonably result in a recapture of the Historic Tax Credits, in each case for the duration of the HTC Compliance Period.

**Transfer Tax Exemption.**  To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, the sale and/or refinancing of the Property shall be exempt from the payment of transfer, stamp, deed, mortgage recording or similar taxes, since all of the transactions are being done, and constitute a "transfer under and in furtherance of a confirmed plan of reorganization" in bankruptcy.

**Procedures for Treating and Resolving Disputed Claims.**  No payments or distributions shall be made with respect to any portion of a Disputed Claim unless and until objections to any Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim in whole or in part.  In the interim, the Disbursing Agent shall establish an appropriate reserve (the "Disputed Claim Reserve") for all Disputed Claims pending resolution thereof.  Payments from the Disputed Claim Reserve shall be paid when and if the Disputed Claim becomes an Allowed Claim in whole or in part.  Following completion of the claim objection process, any unused portion of the Disputed Claim Reserve shall revert to the Debtor.

**E.  Post-Confirmation Stays/Injunctions.**

All stays pursuant to Section 362 of the Bankruptcy Code shall remain in full force and effect until the close of the bankruptcy case and entry of a Final Decree.  All Creditors who hold, have held, or may hold a Claim or Claims against the Debtor are permanently enjoined on and after the Confirmation Date from (i) commencing or continuing in any manner, any action or other proceeding of any kind with respect to any such Claim; (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or Order against the Property;

(iii) creating, perfecting or enforcing any encumbrance of any kind against the Property; and (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Property.

### F. Executory Contracts and Unexpired Leases

**1.        Disposition of the Master Lease.**   A key component of the Plan remains the assumption and continuation of the Master Lease for the remainder of the HTC Compliance Period. Upon a sale, the buyer (or the Debtor in the event of a refinance) shall enter into an amended and restated Master Lease (the "Amended Master Lease") in form necessary to preserve all Historic Tax Credits.  The Amended  Master Lease shall confirm that (a) there are no defaults to be cured; (b) the Master Tenant is not liable for any pre-assumption rent arrears, with the Master Tenant deemed to have paid rent (and Debtor deemed to have received rent) for all periods prior to the date of the entry of an Order approving the assumption of the Master Lease based upon collection of available cash from prior operations of the Property; (c) confirm that all subleases with end-user tenants are entered into by the Master Tenant, as Landlord; all as delineated in the Master Tenant Assumption and Assignment Agreement that is or will be attached to the Plan; and (d) a Subordination, Non-Disturbance and Attornment Agreement that provides, amongst other things, for non-disturbance of the Master Lease for the duration of the HTC Compliance Period. Additionally, the Amended Lease and related amendments to the Master Tenant's operating documents shall provide valuable consideration to the bankruptcy estate by (i) setting forth a post-assumption rent owed by Master Tenant to Debtor (or its successor) under the Master Lease equal to available net cash flow of the Master Tenant after payment of its operating expenses as the operator of the Property under the Master Lease; (ii) provide that amendments to the Master Tenant's operating documents shall be made as necessary to admit an affiliate of the Debtor (or an

affiliate of any buyer of the Property) as the managing member of the Master Tenant, with the rights and obligations necessary to protect the Historic Tax Credits; and (iii) reducing previously negotiated cash requirements of HTC Investor, including priority return and certain other economics owed to HTC Investor.   The foregoing additional consideration contemplated by the Term Sheet is valuable to the Debtor's estate because it constitutes a waiver by Master Tenant of the HTC Investor's bargained for economic returns, including its annual priority return throughout the HTC Compliance Period and its exit payment at the end of the HTC Compliance Period.

2.      **Disposition of Other Executory Contracts and Unexpired Leases.**  All other executory contracts and unexpired residential and commercial leases not previously assumed or rejected by the Debtor shall be deemed assumed as of the Effective Date.  Any defaults with respect to the residential apartment leases or subleases shall be addressed by the Debtor or the acceptable third-party buyer in the regular course of business without any further proceedings in the Bankruptcy Court or specific distributions under the Plan.

G.      **Conditions Precedent to the Effective Date**

**Conditions to the Effectiveness of the Plan.**  Confirmation and the occurrence of the Effective Date shall be conditioned upon (i) the amendment of the Master Lease as described above, together with compliance with the Master Tenant's Conditions and the Property obtaining the requisite TCO for Master Tenant to operate and lease the Property; (ii) entry of the Confirmation Order; and (iii) approval of a Sale or Refinancing either in conjunction with confirmation of the Plan or pursuant to separate motion.

H.      **Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain continuing jurisdiction for the following purposes: (i) To allow, disallow, determine, liquidate, classify, estimate, or establish the treatment of any Claim;

(ii) To decide and determine all matters related to the granting and denying, in whole or in part, of any Professional Compensation; (iii) To decide any dispute relating to the sale or refinancing of the Property prior to a closing thereon; (iv) To adjudicate any motions, adversary proceedings, applications or contested matters that may be pending on the Effective Date; (v) To enter and implement such Orders as may be necessary or appropriate to execute, implement, enforce or consummate the provisions of the Plan, and the distributions hereunder; (vi) To adjudicate any and all disputes arising from or relating to the Plan or any transactions contemplated herein; (vii) To consider any modifications of the Plan to cure any defect or omission, or to reconcile any inconsistency with the Confirmation Order; and (viii) To enter the Final Decree concluding and closing these bankruptcy cases.

## VI.    CONFIRMATION REQUIREMENTS

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129(a) of the Bankruptcy Code, which included finding that:

(a)    The Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor has complied with the applicable provisions of the Bankruptcy Code in promulgating the Plan;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    The Plan is feasible and not likely to be followed by the need for further reorganization; based upon a sale of the Property

(e)    The Plan meets the "Best Interests" test in that creditors will receive more under the Plan than they would receive in a Chapter 7 liquidation; and

(f)    The Plan has been accepted by at least one class of impaired creditors.

### A.       Acceptance

The Debtor anticipates that the Plan will be accepted by both VNB and the Master Tenant. Thus, the Plan will meet the requirement that it be accepted by at least one class of impaired creditors.

### B.       Feasibility

The Bankruptcy Code requires the Debtor to establish that it has the funds necessary to pay creditors on the Effective Date and that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization.  Here, the sale proceeds are being marshalled to enable the Debtor to repay the DIP Loans in full, please pay all administrative expenses and priority claims, and establish the general creditor fund for general unsecured creditors.

### C.       Best Interests Test

The Plan also easily meets the Best Interests test, since creditors stand to receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  In fact, if the Property was liquidated by a Chapter 7 trustee, there would be no funds available to pay any creditors other than the DIP Loan and pre-petition liens held by VNB.

### VII.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtor urge all Creditors to vote to **accept** the Plan.

Dated: New York, NY
      January 10, 2024

                                         Goldberg Weprin Finkel Goldstein LLP
                                         Attorneys for the Debtor
                                         125 Park Avenue, 12th Floor
                                         New York, NY 10017
                                         By: /s/ Kevin J. Nash, Esq.